UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

DOREEN EHRBAR,

                  Plaintiff,

        v.

FOREST HILLS HOSPITAL and NORTH SHORE
LONG ISLAND JEWISH HEALTH SYSTEM,

                 Defendants.

---------------------------------------------------------------

**MEMORANDUM & ORDER**
13-CV-1761 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Doreen Ehrbar brings the above-captioned action against Defendants North

Shore Long Island Jewish Health System ("NSLIJ Health System") and Forest Hills Hospital

(the "Hospital"),[1] alleging age discrimination and retaliation in violation of the Age

Discrimination in Employment Act ("ADEA"), the New York State Human Rights Law

("NYSHRL"), and the New York City Human Rights Law ("NYCHRL").  Defendants moved

for summary judgment on all claims.  (Defs. Mot. for Summ. Judg. ("Defs. Mot."), Docket Entry

No. 34; Defs. Mem. in Support of Defs. Mot. ("Defs. Mem."), Docket Entry No. 34-48.)  For the

reasons discussed below, the Court grants Defendants' motion for summary judgment as to

Plaintiff's age discrimination and retaliation claims under the ADEA and NYSHRL.  The Court

dismisses Plaintiff's NYCHRL claims without prejudice.

    **I.**   **Background**

      In July of 2007, John Udisky hired Plaintiff as the Hospital's Director of Patient Access

---

[1]  NSLIJ Health System is the corporate parent of the Hospital.

Services.[2]  (Defs. 56.1 ¶ 1; Pl. 56.1 ¶ 1.)  Udisky was 54 years old at the time, and Plaintiff was

58 years old.  (Defs. 56.1 ¶ 2; Pl. 56.1 ¶ 2.)  As part of the Patient Access Services Department

(the "PAS Department"), Plaintiff managed a team of registrars and, together with the employees

in the department, had various responsibilities related to patient admission, registration and

payment collection.  (Defs. 56.1 ¶¶ 3–4; Pl. 56.1 ¶¶ 3–4.)  Plaintiff initially reported to Udisky,

but at various times before 2008 she was supervised by others, including Gerri Randazzo and

Bob Hettanbach, before returning to Udisky's supervision.  (Pl. 56.1 ¶ 65.)  According to

Plaintiff, Jackie McCarthy also supervised her for "a few months" in 2012.  (*Id.*)

Although the PAS Department carried out its responsibilities in a number of ways, one of

its most important functions was to manage Emergency Department ("ED") Logbook, which was

critical to the Hospital's ability to comply with the Emergency Treatment and Labor

("EMTALA") regulations.[3]  (Defs. 56.1 ¶ 6; Pl. 56.1 ¶ 6.)

   a.  **Plaintiff's initial performance issues**

According to Defendants, Plaintiff had job performance issues during her first four years

at the Hospital.  (Defs. 56.1 ¶ 8.)  For example, the PAS Department was responsible for

verifying that a patient's insurance company had pre-authorized the patient's surgery prior to the

surgery.  (Defs. 56.1 ¶ 8(a); Pl. 56.1 ¶ 8(a).)  However, despite this responsibility, there were

---

[2]  Defendants submitted a statement of material facts pursuant to Local Rule 56.1 in
support of their motion for summary judgment.  (*See* Defs. Statement Pursuant to Local Rule
56.1 ("Defs. 56.1"), Docket Entry No. 34-49.)  Plaintiff submitted a counter-statement of facts.
(*See* Pl. Resp. to Defs. Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Pl. 56.1"),
Docket Entry No. 37.)

[3]  An inaccurate ED Logbook could subject the Hospital to serious penalties including
fines and loss of revenue streams.  (Defs. 56.1 ¶ 15; Pl. 56.1 ¶ 15.)

occasions when patients arrived for surgery without pre-authorization, delaying their operation.[4]
(Decl. of John Udisky ("Udisky Decl.") ¶ 17.) This problem occurred twice in 2009, prompting
Udisky to ask Plaintiff for a "corrective action plan."[5] (Sept. 24, 2009 and Nov. 3, 2009 emails
to Plaintiff, Defs. Exs. 5 and 6.) Plaintiff admits that these incidents occurred, but asserts they
were caused by physicians who bypassed the PAS Department to schedule surgeries. (Pl. 56.1
¶ 8(a).) According to Plaintiff, she established a system to address the problem. (*Id.*)

There were also issues with Plaintiff's performance in 2010. In early 2010, Udisky
received a letter complaining about how Plaintiff was treating her employees. (Defs. 56.1 ¶ 8(b);
Pl. 56.1 ¶ 8(b).) In addition, the PAS Department had problems with patient wait times. (Defs.
56.1 ¶ 8(c); Pl. 56.1 ¶ 8(c).) The PAS Department was responsible for patient registration, but,
according to Defendants, Plaintiff routinely left her registrars without adequate supervision on
nights and weekends.[6] (Defs. 56.1 ¶ 8(d).) In or about July of 2010, after an incident where a
patient had been "triaged" but not registered for two hours, Gerri Randazzo wrote to Udisky
about the unacceptably long patient wait times. (Defs. 56.1 ¶ 8(c); Pl. 56.1 ¶ 8(c); Udisky Decl.

---

[4] Defendants did not electronically file the Declaration of John Udisky, submitting only a
courtesy copy to the Court.

[5] Although Defendants filed 44 exhibits in support of their motion, they did not annex
them to any particular declaration, and refer to them in each declaration only by their exhibit
numbers. *See* Rule 7.1 of the Local Rules of the United States District Courts for the Southern
and Eastern Districts of New York (requiring parties to submit "[s]upporting affidavits and
exhibits thereto . . . ."). Plaintiff did not object to these supporting exhibits, and relies on them
throughout her opposition papers. The Court references these exhibits by their apparent title and
exhibit number.

[6] Plaintiff asserts that any concern regarding night and weekend supervision does not
"reflect a criticism" of her performance, but concedes there was a problem. (Pl. 56.1 ¶ 8(d).)
According to Plaintiff, she followed the process in place upon her arrival, and attempted to
address night and weekend coverage issues, but the Hospital's administration "denied" her
request. (*Id.*) Plaintiff also asserts that HR "never gave [her] the authorization" to extend her
staff's schedule into the weekend. (*Id.*)

¶ 27.)  In an email that Udisky later forwarded to Plaintiff, Randazzo demanded an investigation and suggested a change in the PAS Department's management.  (July 2010 emails among Udisky, Randazzo and Plaintiff ("July 2010 Emails"), Defs. Ex. 8.)  Thereafter, Udisky directed Plaintiff to address the problem.  (*Id.*)  Plaintiff admits this issue arose in 2010, but contends that the incident prompting Randazzo's concern did not actually involve a wait-time issue.  (Pl. 56.1 ¶ 8(c).)

Another issue arose regarding a backlog of hospital bed assignments.  Throughout 2010, Udisky and other managers noted that the PAS Department had problems assigning hospital beds through the "bed board," which was the Hospital's tool for tracking available emergency room beds.  (Defs. 56.1 ¶ 8(d); Pl. 56.1 ¶ 8(d).)  In March of 2010, after a patient experienced a days-long wait for a hospital bed, then-Executive Director of Patient Care Services, Rita Mercieca, spoke to Plaintiff, expressing disbelief at the situation, and demanding "[n]o more excuses." (Mar. 2, 2010 email from Mercieca to Plaintiff and others, Defs. Ex. 9.)  Backlogs persisted and Mercieca spoke to Plaintiff again in May and June of 2010, expressing concern that bed assignment delays would prevent the PAS Department from reaching the pre-set "metric" for bed assignments.  (*See* May 3, 2010 email from Mercieca to Plaintiff and others, Defs. Ex. 10; June 22, 2010 emails to Plaintiff and others, Defs. Ex. 12.)  Plaintiff does not dispute that there were problems with bed assignments or that Mercieca addressed this issue with her.  (Pl. 56.1 ¶ 8(d); Decl. of Doreen Ehrbar ("Pl. Decl."), ¶ 4, Docket Entry No. 38.)  However, Plaintiff asserts that the Nursing Department caused the problem by failing to inform the PAS Department of available beds.  (Pl. 56.1 ¶ 8(d).)

### b.   Plaintiff's performance evaluations

Despite these issues, Udisky gave Plaintiff generally positive annual performance

evaluations from 2008 through 2010.[7]  (Defs. 56.1 ¶ 9; Pl. 56.1 ¶ 9; Plaintiff's 2008 Performance

Evaluation ("2008 Evaluation"), Defs. Ex. 13; Plaintiff's 2009 Performance Evaluation ("2009

Evaluation"), Defs. Ex. 14; Plaintiff's 2010 Performance Evaluation ("2010 Evaluation"), Defs.

Ex. 15.)  Udisky rated Plaintiff's overall performance as "Meets" expectations each year.  (2008

Evaluation; 2009 Evaluation; 2010 Evaluation.)

Each year, Plaintiff's evaluations indicated that she met or exceeded expectations in all

fifteen competency categories,[8] however, Plaintiff's ratings did fluctuate in some categories.  In

2009, Plaintiff received higher ratings in four areas — "Engagement," "Urgency," "Talent

Development" and "Organizational Awareness" — but lower rating in three others —

"Excellence" "Teamwork" and "Execution".[9]  (Compare 2008 Evaluation with 2009

Evaluation.)  Unlike 2009, Plaintiff's 2010 evaluation indicated lower ratings in six areas —

"Engagement," "Technical/Analytical Skill," "Urgency," "Talent Development," "Team

Leadership," and "Organizational Awareness" — all of which were areas of improvement in

---

[7] The evaluations contain the following fifteen categories: Excellence, Teamwork, Integrity, Caring, Innovation, Patient First, Accountability/Ownership, Adaptability, Engagement, Execution, Technical/Analytical Skill, Urgency, Talent Development, Team Leadership, and Organizational Awareness.  There is also an "Overall Rating."  For each, the reviewer can rate the employee as "Does Not Meet" "Meets" "Exceeds" the reviewer's expectations or "Not Applicable."  The reviewer can also provide an "Individual Development Plan."  (See 2008 Evaluation; 2009 Evaluation; 2010 Evaluation.)

[8] The evaluations also include a category for "Department or Business Related Goals," which, beginning in 2009, rated Plaintiff in the sub-categories of "Financial," "Quality" and "Service."  (See e.g., 2009 Evaluation.)  Plaintiff received "Does Not Meet" ratings in some of these three sub-categories from 2009 through 2011, however, Udisky noted that he rated these three categories based on the Hospital's performance overall, rather than on Plaintiff's individual performance.  (See 2009 Evaluation; 2010 Evaluation; 2011 Evaluation.)

[9] Plaintiff's evaluation changed from "Exceeds" to "Meets" expectations in these categories.  (2009 Evaluation.)

2009.[10]  (*Compare* 2009 Evaluation *with* 2010 Evaluation.)

Although Udisky gave Plaintiff overall positive ratings, he also gave her "Development

Goals" for each year.  In 2009, Udisky recommended that Plaintiff "[p]rovide greater supervision

in the ED registration area" and "increase performance for the ED Discharge Process."  (2009

Evaluation.)  In 2010, Udisky again noted the need for Plaintiff to arrange for greater

management supervision of employees in the ED registration area, stating, "[Plaintiff] [n]eeds to

incorporate Management supervision into evening and weekend coverage," and to "verify that

clerical staff is completing all levels of responsibilities," including "timely and accurate

completion of the ED Log."  (2010 Evaluation.)  In addition, Udisky encouraged Plaintiff to

"[c]ontinue [] improv[ing] upon accurate collection of patient demographic data . . . ."  (*Id.*)

   c.   **Plaintiff's 2011performance and ED Logbook issues**

Additional issues arose with Plaintiff's performance in 2011.  In March, an employee

accused Plaintiff of racial discrimination.  (Defs. 56.1 ¶ 8(e); Pl. 56.1 ¶ 8(e).)  Two months later,

after an investigation, the Human Resources ("HR") Department found that Plaintiff had not

discriminated against the employee, but required Plaintiff to complete courses to improve her

communication and management skills.  (Defs. 56.1 ¶ 8(e); Pl. 56.1 ¶ 8(e); Udisky Decl. ¶ 66.)

In August, HR informed Udisky that Plaintiff interfered with their investigation of one of

Plaintiff's employees.  (Defs. 56.1 ¶ 8(f); Udisky Decl. ¶ 51.)  According to Udisky, he learned

that Plaintiff had spoken with the target employee and asked about the underlying misconduct,

which alerted the employee to the investigation.  (Udisky Decl. ¶ 51.)  Udisky raised the issue

---

[10]  Defendants assert that these evaluations reflect Udisky's "leniency" in evaluating his
employees.  (Defs. 56.1 ¶ 9; Dep. of John Udisky ("Udisky Dep.") 147:15–148:3, Defs. Ex. 41.)
Plaintiff disputes that characterization, asserting that her 2008 through 2010 evaluations
accurately reflect the quality of her work.  (Pl. 56.1 ¶ 9(b).)

directly with Plaintiff.  (*Id* ¶ 56.)  Plaintiff admits that during the investigation she spoke with the employee about the allegations, but denies that this constituted interference because she acted at the direction, and with the approval of, the Labor Relations and HR department.  (Pl. 56.1 ¶ 8(f); Dep. of Doreen Ehrbar ("Pl. Dep.") 126:21–130:5, Defs. Ex. 40.)

A serious issue arose in December of 2011, when the New York State Department of Health ("DOH") inspected the Hospital and reviewed the ED Logbook for compliance with EMTALA regulations.  (Defs. 56.1 ¶ 17; Pl. 56.1 ¶ 17.)  The ED Logbook contained information about the Hospital's emergency room patients, including their names, demographic information, treating physicians, and "final dispositions."  (Defs. 56.1 ¶¶ 7, 10–12; Pl. 56.1 ¶¶ 7, 10–12.)  Regulators like the DOH reviewed the information maintained in the ED Logbook to determine whether the Hospital was complying with the EMTALA statute, or was "patient dumping" by turning away prospective emergency room patients who could not pay.  (Defs. 56.1 ¶¶ 7, 10–12; Pl. 56.1 ¶¶ 7, 10–12.)  Logbook inaccuracies could subject the Hospital to fines of at least $25,000 and the potential loss of Medicaid and Medicare payments, which accounted for 70% of the Hospital's revenue.  (Defs. 56.1 ¶ 15; Pl. 56.1 ¶ 15.)

The PAS Department possessed the ED Logbook, (Defs. 56.1 ¶ 39; Pl. 56.1 ¶ 39; Pl. Dep. 70:17–22), but the parties dispute whether Plaintiff, as head of the PAS Department, had exclusive or shared responsibility for maintaining the ED Logbook.  According to Plaintiff, the ED Logbook was a "shared responsibility" between the PAS Department and the ED Nursing Department, which was led by Miriam Chapman.  (Pl. 56.1 ¶ 10; Pl. Decl. ¶ 9.)  Plaintiff asserts that Chapman's department provided the ED Logbook's "disposition information," which was then entered into the Logbook by PAS Department staff and volunteers.  (*Id.*)  It is undisputed that Plaintiff's registrars were responsible for entering information into the Logbook, (Defs. 56.1

¶ 14; Pl. 56.1 ¶ 14), but Plaintiff asserts that the accuracy of the information depended on the accuracy of the data provided by Chapman's department, (Pl. Decl. ¶ 9).  According to Defendants, the PAS Department was "exclusively responsible for maintaining the ED Logbook," and had access to all the necessary information for the Logbook.  (Defs. 56.1 ¶ 13.)

During the December 2011 inspection, DOH uncovered at least one error in the ED Logbook.  (Defs. 56.1 ¶ 18; Pl. 56.1 ¶ 18.)  Plaintiff asserts that the error was that a child visited the emergency room twice in one day, but only appeared once in the Logbook.  (Pl. 56.1 ¶¶ 18–19; Pl. Dep. 63:6–13.)  According to Defendants, the DOH inspection revealed that the PAS Department was failing to log "each and every patient" and record each patient's disposition accurately.  (Defs. 56.1 ¶¶ 18–19.)  The Hospital began the process of a major corrective action to address DOH's findings and ensure the Hospital's compliance with the ED Logbook requirements.  (Defs. 56.1 ¶ 20; Pl. 56.1 ¶ 20.)

According to Plaintiff, after the DOH visit, the Logbook became a focus for the staff, (Pl. Dep. 65:2–4), and the PAS Department teamed with other departments to develop a corrective plan, (Defs. 56.1 ¶ 21; Pl. 56.1 ¶ 21).  Her staff followed the plan, creating reports matching the ED Logbook information that the PAS Department compared and reconciling them with the Logbook each day.  (Pl. 56.1 ¶ 20; Pl. Dep. 63:14–64:8.)

### d.   Change in executive management

A change in the Hospital's management coincided with the negative DOH inspection.  In November 2011, Rita Mercieca replaced Gerri Randazzo as the Hospital's Executive Director, and Brian O'Neill became the Hospital's Deputy Executive Director.  (Defs. 56.1 ¶¶ 23–24; Pl. 56.1 ¶¶ 23–24.)  This new management was committed to improving the Hospital's performance.  (Defs. 56.1 ¶ 27; Pl. 56.1 ¶ 27.)  They planned to focus on various areas, including the ED

Logbook, which was of "crucial importance" to them.  (Defs. 56.1 ¶ 25; Pl. 56.1 ¶ 25.)  The new

management also encouraged management staff, like Udisky and Plaintiff, to "achieve new

levels of excellence."  (Defs. 56.1 ¶ 25; Pl. 56.1 ¶ 25.)

After assuming his new role, O'Neill met with Udisky and discussed the upcoming 2011

evaluation process.  (Defs. 56.1 ¶ 26; Pl. 56.1 ¶ 26.)  O'Neill told Udisky to evaluate the

employees reporting to Udisky "in a more serious fashion," and include additional "constructive

performance analysis."  (Defs. 56.1 ¶¶ 27–28; Pl. 56.1 ¶¶ 27–28; Udisky Dep. 148:11–15.)

According to Udisky, O'Neill was "pretty tough" in evaluations and noted their importance.

(Udisky Dep. 149:2–3.)

At some point in 2011, Udisky completed evaluations for his subordinates, including

Plaintiff.  (2011 Evaluation, Defs. Ex. 23.)  The record is unclear as to O'Neill's role in these

evaluations.  Udisky testified that he "sat with" O'Neill, and they prepared the 2011 evaluations

together.  (Udisky Dep. 132:16–133:25.)  However, O'Neill testified that he had no role in

preparing Plaintiff's 2011 evaluation, stating that Plaintiff's "direct supervisor was responsible

for writing it."  (Dep. of Brian O'Neill ("O'Neill Dep.") 26:3–6, Ex. 42.)

Plaintiff's 2011 evaluation was more negative than her prior evaluations.[11]  Plaintiff's

ratings in the 2011 evaluation saw no increases, and decreased in nine competency categories.

(2011 Evaluation.)  For the first time Plaintiff received a "Does Not Meet" rating in eight

---

[11]  Plaintiff asserts that Udisky evaluated more than three people in 2011, and points to
Udisky's alleged evaluations of Marilyn Renaudin-Guerrier and Kevin Wallace.  (Pl. 56.1 ¶ 28.)
Plaintiff further asserts that these employees were in their 30's and 40's respectively, and, based
on Plaintiff's conversations with them, they received generally positive evaluations consistent
with the prior year.  (*Id.*)  Plaintiff's testimony about her conversations with other employees
about the substance of their evaluations is hearsay, and Plaintiff does not present any basis to
admit these statements.  Regardless, these facts are immaterial to the Court's resolution of this
motion.

"Competency" categories — "Teamwork," "Integrity," "Caring," "Innovation,"

"Accountability/Ownership," "Execution," "Talent Development," and "Team Leadership" —

two of which were downgraded from "Exceeds" in 2010 — "Integrity," and "Caring." (2011

Evaluation.) In February of 2012, Udisky met with Plaintiff to discuss the evaluation. (Defs.

56.1 ¶¶ 26, 28; Pl. 56.1 ¶¶ 26, 28.) Plaintiff submitted a rebuttal, challenging parts of the

evaluation. (Pl. Dep. 57:8–14.)

Plaintiff asserts that the evaluation does not reflect Udisky's real view of her performance

because, in December of 2011, Plaintiff and Udisky prepared a "Patient Access Services

Transition Plan" containing a review of the PAS Department. (Pl. 56.1 ¶ 69; Patient Access

Services Transition Plan ("PAS Transition Plan"), annexed to Decl. of Steven Morelli ("Morelli

Decl.") as Ex. A.) The document is not dated, but details strengths and weaknesses of the PAS

Department, highlights 2012 goals, and notes "Personal Accomplishments."[12] (PAS Transition

Plan 1–3.)

### e.   Plaintiff's 2012 performance and March 2012 incident

According to Plaintiff, after the 2011 evaluation, "there was fault with everything that

[she] did," and the staff would "take a word and they would blow it up to make it, [*sic*] the whole

process was wrong." (Pl. Dep. 188:2–7.) Throughout 2012, issues with Plaintiff's performance

persisted. In January of 2012, the Labor Relations department complained about how Plaintiff

scheduled her staff, in particular that she repeatedly scheduled one part-time employee for hours

---

[12] The ED Logbook is referenced in the Transition Plan's "Personal Accomplishments," which states, "[w]orked with the Patient Relations Department to utilize volunteers in the ED Log Book." (PAS Transition Plan 1.) The Transition Plan does not specify the employee to whom this accomplishment refers. (*Id.*)

exceeding the employee's allotment.[13]   (Defs. 56.1 ¶ 29(a); Pl. 56.1 ¶ 29(a); Udisky Decl. ¶¶ 103–06.)  Plaintiff concedes there was at least one complaint, but asserts that she made all scheduling decisions in accordance with the PAS Department policy given the Hospital's coverage needs, patient satisfaction, and financial restrictions.  (Pl. 56.1 ¶ 29(a).)

In March of 2012, the PAS Department committed another error.  (Defs. 56.1 ¶ 29(c); Pl. 56.1 ¶ 29(c).)  When an emergency room patient died, the Hospital attempted to contact the decedent's family.  (Mar. 5, 2012 email from Udisky to Ehrbar et al., Defs. Ex. 26.)  Although the PAS Department was in charge of collecting demographic information, the decedent's demographic information on file was incorrect, and the Hospital was unable to contact the patient's family.  (*Id.*)  As a result, the family did not learn of the patient's death until they came to pick up the patient.  (*Id.*)

### f.   Discrimination complaint

In or about April of 2012, Plaintiff hired a lawyer and sent a letter to NSLIJ Health System's President and CEO Michael Dowling, at his Great Neck, New York office.[14] (Defs. 56.1 ¶¶ 48–49; Pl. 56.1 ¶¶ 48–49.)  The letter states that Plaintiff was experiencing age discrimination.  (Letter to M. Dowling dated April 25, 2015 ("Pl. April 25 Ltr.") 3, Defs. Ex. 39.) The letter recounts Plaintiff's positive performance evaluations for the years 2008 through 2010,

---

[13]   Defendants assert that there was more than one staffing incident.  (Defs. 56.1 ¶ 29(a).) A letter, dated January 20, 2012, from a Labor Relations Manager to Plaintiff's personnel file recounts a staffing issue involving Plaintiff and another employee who Plaintiff repeatedly staffed for double the number of permissible weekly hours for each employee.  (Jan. 20, 2012 letter from S. Kapochunas to D. Ehrbar Personnel File, Defs. Ex. 24.)  The letter also reports that an employee had difficulty with Plaintiff in scheduling a vacation.  (*Id.*)

[14]   Plaintiff did not send the letter to anyone at the Hospital.  (Defs. 56.1 ¶¶ 48, 54; Pl. 56.1 ¶¶ 48, 54.)

and states that the negative 2011 evaluation was not based on her work product and came as a "shock" to Plaintiff. (*Id.* at 2.) The letter also details numerous incidents in support of Plaintiff's claim of age discrimination, including that HR forced Plaintiff to take communications courses after a false discrimination allegation, that she was "wrongly blamed" for interfering with an investigation and mismanaging staff vacation times, and that management seemed to be searching for reasons to "substantiate" the 2011 performance evaluation. (*Id.* at 2–3.)

After Dowling's staff received the letter, someone forwarded the letter to the NSLIJ Health System's Office of Legal Affairs, also in Great Neck, New Jersey (Defs. 56.1 ¶¶ 51–52; Pl. 56.1 ¶¶ 51–52.) However, due to an unspecified issue in their Office of Legal Affairs, the letter went to a paralegal and remained "on [the] paralegal's desk" until after Plaintiff filed a post-termination complaint with the United States Equal Employment Opportunity Commission ("EEOC") in September of 2012.[15] (Defs. 56.1 ¶ 53; Pl. 56.1 ¶ 53.) It is undisputed that no one at the Hospital knew that Plaintiff had sent a letter complaining of age discrimination until after the EEOC sent Defendants a notice in September of 2012. (Defs. 56.1 ¶ 54; Pl. 56.1 ¶ 54.)

---

[15] Defendants submitted a declaration from Elizabeth Dore, Senior Associate General Counsel in NSLIJ Health System's Office of Legal Affair, explaining the Legal Affairs' process for dealing with letters sent to Dowling, but Dore only "vaguely recall[ed]" Plaintiff's letter. (Declaration of Elizabeth Dore ("Dore Decl.") ¶¶ 4–7, Docket Entry No. 34-50.) Dore recalls giving the letter to a paralegal, and not seeing it again until September 2012. (*Id.* ¶ 7.) Upon receiving the EEOC "Notice of Charge of Discrimination," in September of 2012, and reading the retaliation allegation, Dore "immediately went to [the] paralegal's office to see what had become of [Plaintiff's letter]." (*Id.* ¶ 9.) Dore submits that the letter was found under papers in the paralegal's office and no "work up" had been completed. (*Id.*) According to Dore, NSLIJ contacted no one at the Hospital to alert them about the letter. (*Id.*)

g.   **ED Logbook errors and DOH inspections**

According to Defendants, chief among Plaintiff's additional problems in 2012[16] were the continued issues with the ED Logbook.  (Defs. 56.1. ¶¶ 40–43; Udisky Decl. ¶ 114.)  In April of 2012, DOH returned to the Hospital to review the ED Logbook.  (Defs. 56.1 ¶ 33; Pl. 56.1 ¶ 33.) The review required medical records from the ED, but because the records were unavailable, the DOH postponed its review.  (Defs. 56.1 ¶ 34; Pl. 56.1 ¶ 34.)  Given DOH's impending return, the Hospital's Associate Executive Director of Quality Management, Linda Dascher, who had partnered with Plaintiff on the ED Logbook corrective action plan, informed Plaintiff that she must ensure the ED Logbook "stay[ed] up to date."  (Defs. 56.1 ¶ 35; Pl. 56.1 ¶ 35.)  At that time, and at her deposition, Plaintiff acknowledged that the PAS Department had responsibility for the Logbook.  (Defs. 56.1 ¶¶ 36–37; Pl. 56.1 ¶¶ 36–37.)  Plaintiff now asserts that the responsibility was "shared" with Miriam Chapman's department.  (Pl. 56. 1 ¶ 36.)

On July 19, 2012, DOH returned to the Hospital to inspect the ED Logbook.  (Defs. 56.1 ¶ 40; Pl. 56.1 ¶ 40.)  At that point, Plaintiff had been "working hard" for seven months to ensure the ED Logbook's compliance, and had told upper management that the PAS Department was auditing the ED Logbook daily to ensure it was correct.  (Defs. 56.1 ¶ 41; Pl. 56.1 ¶ 41.)

During its inspection, DOH found that seven of the ten charts from the ED Logbook had errors.  (Defs. 56.1 ¶ 42; Pl. 56.1 ¶ 42.)  As a result, Deputy Executive Director O'Neill met with Plaintiff to discuss the errors and Plaintiff's process for ensuring the ED Logbook was complete and accurate.  (Defs. 56.1 ¶ 43; Pl. 56.1 ¶ 43.)  According to Defendants, Plaintiff stated that she

---

[16]   In addition to the problems detailed above, the parties agree that, in 2012, there were complaints about the PAS Department not answering its telephones and about errors in reports that Plaintiff's staff circulated.  (Defs. 56.1 ¶¶ 29(b), (e); Pl. 56.1 ¶¶ 29(b), (e); Emails between J. Udisky and D. Ehrbar, Defs. Ex. 25.)

knew the PAS Department was responsible for the ED Logbook, but asserted that her

"volunteers" had not performed work related to the ED Logbook as expected.  (Defs. 56.1 ¶ 44.)

Plaintiff does not respond to the assertion that, when meeting with Udisky, she stated the PAS

Department had responsibility for the ED Logbook; instead, she asserts that the responsibility

was shared with Miriam Chapman's Nursing Department.  (Pl. 56.1 ¶ 44.)  As to the errors in the

ED Logbook, Plaintiff asserts that "most of the errors" were the product of receiving incorrect

information from ED clerical staff within Chapman's group.  (*Id.*)  Citing a memorandum from

O'Neill to "File," dated July 19, 2012, Defendants assert that Plaintiff acknowledged that her

managers had not been monitoring the staff for compliance and there was no procedure in place

to audit their compliance.  (Defs. 56.1 ¶ 45; Defs. O'Neill Memorandum to File, Ex. 34.)

Plaintiff denies making this statement.  (Pl. 56.1 ¶ 45.)

### h.    Plaintiff's termination

According to Defendants, by mid-August of 2012, Udisky had decided to terminate

Plaintiff's employment because of her ongoing performance issues and mismanagement of the

ED Logbook.  (Defs. 56.1 ¶ 46.)  At some point, Udisky consulted with O'Neill about firing

Plaintiff.  (Defs. 56.1 ¶¶ 47, 54; Pl. 56.1 ¶¶ 47, 54.)  On August 13, 2012, Plaintiff met with

Udisky, Fisher, and O'Neill, and they gave her two options: resign or be terminated.  Plaintiff

chose to be terminated.  (Defs. 56.1 ¶ 47; Pl. 56.1 ¶ 47.)  According to Plaintiff, they told her she

was terminated because of the ED Logbook.  (Pl. 56.1 ¶ 72; Pl. Dep. 211: 23–212:7.)  A

termination letter dated August 13, 2012, and addressed to Plaintiff states that she was

terminated "for unsatisfactory performance."  (Letter dated Aug. 13, 2012 ("Termination

Letter"), Defs. Ex. 36.)  Plaintiff was sixty-three years old at the time of her termination.  (Pl.

56.1 ¶ 2.)  On August 17, 2012, Plaintiff filed an age discrimination complaint with the EEOC.

(Pl. 56.1 ¶ 75.)

### i.  Plaintiff's replacement

In November 2012, the Hospital hired Martin Muratore to replace Plaintiff as Director of the PAS Department.  (Defs. 56.1 ¶ 55; Pl. 56.1 ¶ 55.)  Muratore was sixty-one years old and was recommended by a California facility where he worked in a similar position.  (Defs. 56.1 ¶ 55; Pl. 56.1 ¶ 55.)  A year later, in November of 2013, Muratore resigned or was terminated.[17]

On April 2, 2013, after receiving a "right to sue letter" from the EEOC, Plaintiff timely filed this action.  (Pl. 56.1 ¶ 75.)

## II.  Discussion

### a.  Standard of review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *Kwong v. Bloomberg*, 723 F.3d 160, 164–65 (2d Cir. 2013).  The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.  The "mere existence of a scintilla of evidence" is not

---

[17]  Plaintiff asserts that Defendants terminated Muratore.  (Pl. 56.1 ¶ 55.)  Udisky testified that Muratore was terminated.  (Udisky Dep. 82:11–15.)  Defendants submitted an email from Muratore to Angela Fisher dated November 12, 2013, wherein Muratore provides his resignation.  (Email from Muratore to Fisher dated Nov. 12, 2014, Defs. Ex. 38.)

sufficient to defeat summary judgment. *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). The Second Circuit has cautioned that "[w]here an employer acted with discriminatory intent, direct evidence of that intent will only rarely be available, so affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Taddeo v. L.M. Berry & Co.*, 526 F. App'x 121, 122 (2d Cir. 2013) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)).

### b.  Age discrimination — ADEA and NYSHRL

Plaintiff claims that Defendants discriminated against her on the basis of age in violation of the ADEA and the NYSHRL. (Compl. ¶ 43, Docket Entry No. 1.) Courts assess such claims under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Gorzynski*, 596 F.3d at 105–106; *Spiegel v. Schulmann*, 604 F.3d 72, 83 (2d Cir. 2010) (applying framework to NYSHRL). Under that framework, a plaintiff must first establish a prima facie case of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010). A plaintiff's burden at this stage is "minimal." *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008) (quoting *Hicks*, 509 U.S. at 506). If the plaintiff satisfies this initial burden, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Hicks*, 509 U.S. at 506–07; *Ruiz*, 609 F.3d at 492. The defendant's burden "is not a particularly steep hurdle." *Hyek v. Field Support Servs.*, 702 F. Supp. 2d 84, 93 (E.D.N.Y. 2010), *aff'd*, 461 F. App'x 59 (2d Cir. 2012). This burden "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *Hicks*, 509 U.S.

at 509).

However, even if the defendant offers a legitimate, nondiscriminatory explanation for its

actions, summary judgment is not warranted if the plaintiff can show that an explanation was

pretext.  The plaintiff must show that "the evidence, viewed in the light most favorable to the

plaintiff, would permit a jury to find . . . . that age was the 'but-for' cause of the challenged

adverse employment action."[18]  *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168 (2d Cir. 2014)

(per curiam) (internal quotation marks omitted) (quoting *Gorzynski*, 596 F.3d at 106).  That age

was a "but for cause" does not mean "that age was the employers [*sic*] *only* consideration, but

rather that the adverse employment action *would not have occurred without it.*"  *Id.* at 169

---

[18]  Whether the "but for" standard applies to NYSHRL discrimination claims remains
unresolved in New York state courts.  *See DeKenipp v. State*, 949 N.Y.S.2d 279, 282 (App. Div.
2012) ("This Court has not yet determined whether this recent and more stringent federal
standard applies to the analysis of age discrimination under the Human Rights Law and we
decline to reach that issue here . . . ." (internal citations omitted)).  *But see Anderson v. Young &
Rubicam*, 890 N.Y.S.2d 45, 46 (App. Div. 2009) (noting that "case law endorses the 'but for'
language," citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009), and finding that "[t]he
requested mixed motive charge was unwarranted").  The Second Circuit has "assumed, without
deciding, that the ADEA's 'but for' standard of causation also applies to age discrimination
claims brought under the NYSHRL," noting that "New York courts have yet to rule definitively
on this issue."  *Mikinberg v. Bemis Co.*, 555 F. App'x 34, 35 (2d Cir. 2014) (citing *DeKenipp*, 49
N.Y.S.2d at 281–82); *see Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 n.6 (2d Cir.
2010) ("The law governing ADEA claims has been held to be identical to that governing claims
made under the NY[S]HRL.  Accordingly, we assume, without deciding, that the Supreme
Court's *Gross* decision affects the scope of the NY[S]HRL law as well as the ADEA." (internal
citations omitted)).  The Court follows the Second Circuit and courts in this Circuit, and applies
the "but for" standard to Plaintiff's NYSHRL age discrimination claims.  *See e.g.*, *Allen v.
Chanel, Inc.*, No. 12-CV-6758, 2015 WL 3938096, at *4 (S.D.N.Y. June 26, 2015) ("With
regard to ADEA and NYSHRL claims, 'the plaintiff retains the burden of persuasion to establish
that age was the 'but-for' cause of the employer's adverse action." (citing *Gross*, 557 U.S. at 177
and *Gorzynski*, 596 F.3d at 106)); *Siani v. State Univ. of N.Y. at Farmingdale*, 7 F. Supp. 3d 304,
321 (E.D.N.Y. 2014) ("[T]he Second Circuit assumed without deciding in *Gorzynski* that
*Gross*'s 'but-for' causation standard applied to the NYHRL also.  This Court adopts the same
assumption." (internal citations omitted)); *Glenwright v. Xerox Corp.*, 832 F. Supp. 2d 268, 279
(W.D.N.Y. 2011) (applying *Gross*'s "but for" standard to NYSHRL age discrimination claim);
*Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 574 (S.D.N.Y. 2010) (same).

(internal quotation marks and alteration omitted) (quoting *Fagan v. U.S. Carpet Installation, Inc.*, 770 F. Supp. 2d 490, 496 (E.D.N.Y. 2011)).

Defendants move for summary judgment on Plaintiff's ADEA claims, arguing that Plaintiff has not shown an inference of discrimination to establish a prima facie case of discrimination, and that even assuming Plaintiff could do so, no reasonable jury could find that Defendants' legitimate non-discriminatory reasons for firing Plaintiff were pretext.

### i.   Inference of discrimination

To establish a prima facie case of age discrimination under the ADEA and NYSHRL, a plaintiff must show that, (1) "she was within the protected age group," (2) "she was qualified for the position," (3) "she experienced adverse employment action," and (4) "such action occurred under circumstances giving rise to an inference of discrimination." *Gorzynski*, 596 F.3d at 107. Here, there is no dispute that Plaintiff has established the first three parts of her prima facie case. (Defs. Mem. 14; Pl. Mem. in Opp'n to Defs. Mot. ("Pl. Opp'n") 11, Docket Entry No. 36.) Plaintiff was fifty-eight years old when she was hired and therefore a member of the protected class, she was qualified for the position, and she suffered an adverse employment action when Defendants terminated her on August 13, 2012. The only issue is whether Plaintiff can establish that her termination occurred under circumstances giving rise to an inference of discrimination. Plaintiff asserts that she has raised an inference of discrimination because Defendants treated her differently than similarly situated younger employees who engaged in similar conduct. (Pl. Opp'n 14–15.) Defendants assert that Plaintiff cannot raise an inference of discrimination because Plaintiff (1) presents no evidence that similarly situated younger workers were treated more favorably than Plaintiff, (2) was within the protected class when hired and terminated by the same actor, who was also within the protected age group; and (3) was replaced by a member

of the protected age group.  (Defs. Mem. 15–20.)

A plaintiff can raise an inference of age discrimination by showing that she (1) was similarly situated to other younger employees, and (2) was treated less favorably than those employees.  *See Raspardo v. Carlone*, 770 F.3d 97, 126 (2d Cir. 2014) ("[T]he plaintiff [must] show that the employer treated him or her 'less favorably than a similarly situated employee' outside of the protected group." (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)); *Ruiz*, 609 F.3d at 493 ("A showing of disparate treatment . . . is a recognized method of raising an inference of discrimination for the purposes of making out a *prima facie* case."); *Berube v. Great Atl. & Pac. Tea Co.*, 348 F. App'x 684, 686 (2d Cir. 2009) ("[P]laintiff has proffered sufficient evidence to make out a *prima facie* claim of discriminatory intent by demonstrating that younger, similarly-situated employees received progressive discipline for transgressions of comparable seriousness while he did not.").

This "comparator" does not need to be "identical" to the plaintiff; only "similarly situated in all material respects."  *Raspardo*, 770 F.3d at 126 (citing *Graham*, 230 F.3d at 40); *see Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997).  Those "material respects" will "var[y] somewhat from case to case," and the relevant factors are whether the plaintiff and potential comparator were (1) "subject to the same performance evaluation and discipline standards" and (2) "engaged in comparable conduct."  *Ruiz*, 609 F.3d at 493–94 (quoting *Graham*, 230 F.3d at 40); *Graham*, 230 F.3d at 40 (requiring "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical").

The employees' positions, job responsibilities, and reporting structures are relevant.  *See Shaw v. McHugh*, No. 12-CV-6834, 2015 WL 1400069, at *9 (S.D.N.Y. Mar. 26, 2015)

("Distinctions in assignment, reporting structure, responsibilities and workplace standards undercut Plaintiff's argument that his comparators are similarly situated."); *Boakye-Yiadom v. Laria*, No. 09-CV-622, 2012 WL 5866186, at *4 (E.D.N.Y. Nov. 19, 2012) (proffered comparators lacked similar responsibilities where although there was "some evidence" that other employees assisted with the budget, the plaintiff did not point to evidence suggesting they shared "the ultimate responsibility" for the budget); *Martin v. State Univ. of N.Y.*, 704 F. Supp. 2d 202, 226 (E.D.N.Y. 2010) (proffered comparators had "marked differences" in job responsibilities). However, the Second Circuit has found that an employee with a different supervisor can still serve as a comparator where the employee and comparator were "subject to the same workplace standards and disciplinary procedures." *Berube*, 348 F. App'x at 686–87 ("[T]he fact that Berube had a different supervisor from the employees he cites as comparators does not appear sufficient in itself to preclude Berube from showing that he was subject to the same workplace standards and disciplinary procedures." (citing *Graham*, 230 F.3d at 40 and *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 97 (2d Cir. 1999))); *see Dall v. St. Catherine of Siena Med. Ctr.*, 966 F. Supp. 2d 167, 184 (E.D.N.Y. 2013) ("Similarly situated employees do not necessarily need to share the same position, nor do they necessarily need to report to the same supervisor." (internal quotation marks and alteration omitted))).

Where the argument of disparate treatment is based on disparate enforcement of company policy, a plaintiff must show that "similarly situated employees who went undisciplined engaged in comparable conduct." *Graham*, 230 F.3d at 40. The conduct in question must be of "comparable seriousness," but it does not have to be identical. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804). In addition, "[t]he determination that two acts are of comparable seriousness requires . . . an examination of the context and surrounding circumstances in which those acts are

evaluated." *Id.*; *see Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 464 (S.D.N.Y. 2006) ("When a plaintiff's misconduct is objectively more serious than that of a proposed comparator, differential treatment by the employer does not create an issue of fact that will defeat a motion for summary judgment.").

In sum, there should be an "objectively identifiable basis for comparability." *Graham*, 230 F.3d at 40. Because the inquiry is so fact-specific, "[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury." *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 54 (2d Cir. 2014) (quoting *Graham*, 230 F.3d at 39); *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (same).

Here, Plaintiff asserts that Miriam Chapman was a similarly situated younger employee who Defendants treated more favorably.[19] (Pl. Opp'n 14–15.) Plaintiff concedes that she and Chapman had very different roles at the Hospital. While both Plaintiff and Chapman were directors, they were in different departments and had different supervisors — Chapman was in the ED reporting to Doreen O'Grady, the Nurse Executive, while Plaintiff was in the PAS Department reporting to Udisky. (Defs. 56.1 ¶¶ 59–64; Pl. 56.1 ¶¶ 59–64.) Plaintiff was a "clerical" employee whereas Chapman was a registered nurse and a "clinical" employee such that they were subject to different "performance issues" and metrics. (Defs. 56.1 ¶ 64; Pl. 56.1 ¶ 64.) When Plaintiff was terminated, Chapman was forty-nine years old and was therefore also a member of the same protected class. (Decl. of Lauren Levine ¶¶ 17, 17 n.2, Docket Entry No. 34-45; (Dep. of Miriam Chapman ("Chapman Dep.") 41:4–8, Defs. Ex. 43.) Defendants argue that given Chapman and Plaintiff's membership in the same protected class and the differences

---

[19] According to Defendants, in discovery, Plaintiff identified additional comparators. (Defs. Mem. 18.) However, in opposing summary judgment Plaintiff relies only on Chapman. (Pl. Opp'n 14–15.)

in their roles at the Hospital, they are not similarly situated.  (Defs. Mem. 15–20.)

However, Plaintiff's disparate treatment argument focuses on the respective roles of Plaintiff and Chapman with regard to the ED Logbook.  According to Plaintiff, she shared responsibility for the ED Logbook's accuracy with Chapman, but when DOH uncovered errors in the Logbook, Defendants only disciplined Plaintiff.  (Pl. 56.1 ¶¶ 10(b), 72–74.)  Plaintiff argues that this difference in treatment for similar conduct raises an inference of discrimination.  (Pl. Opp'n 15.)  Defendants argue that because Plaintiff had exclusive responsibility for the Logbook and its errors, there is no inference of discrimination.  (Defs. Mem. 18–20; Defs. Reply in Support of Defs. Mot. ("Defs. Reply") 4–5, Docket Entry No. 35.)

Despite Defendants' assertions, there are disputed factual issues as to Chapman's shared responsibility for the ED Logbook, which the Court cannot resolve on a summary judgment motion.  Both Chapman and her supervisor assert that Chapman was responsible only for the accuracy of the information her clerks entered into the "Envision" computer program and not the accuracy of the information in the ED Logbook, even though the information from Envision was included in the ED Logbook's information.  (Chapman Dep. 25:15–26:22; Decl. of Doreen O'Grady ("O'Grady Decl.") ¶¶ 8–10, Docket Entry No. 34-46)  Similarly, in sworn declarations, Udisky and O'Neill assert that Plaintiff, not Chapman, was exclusively responsible for the accuracy of the ED Logbook.  (Udisky Decl. ¶¶ 73, 78; O'Neill Decl. ¶ 9.)  However, Udisky testified multiple times during his deposition that Chapman and Plaintiff shared responsibility for the accuracy of the ED Logbook, corroborating Plaintiff's assertion.[20]  In addition, O'Neill

---

[20]  *See* Udisky Dep. 95:23–25 ("Miriam and Doreen are supposed to work together to ensure the logbooks are completed accurately."); *id.* at 96:10–17 ("Q. . . . Are there any other individuals at the hospital who were responsible for making sure that the information in the

testified that Chapman's name came up in at least one meeting he attended about responsibility for the ED Logbook.  (O'Neill Dep. 88:6–89:3.)  As to Chapman and Plaintiff's treatment, Udisky testified that he viewed the ED Logbook issues as "extremely serious" and that this "drove his decision" to fire Plaintiff, (Udisky Decl. ¶ 72), but unlike Plaintiff, Chapman was never disciplined or even spoken to about the errors in the ED Logbook, (Chapman Dep. 45:2–9).  Taken together, there are sufficient facts from which a jury could find that Chapman and Plaintiff were jointly responsible for the ED Logbook, and therefore similarly situated, but received disparate treatment based on the errors in the ED Logbook

　　　Although Defendants identify the differences between Chapman and Plaintiff, those differences would not preclude a reasonable jury from finding that they were similarly situated with respect to the particular circumstances of this case.  Chapman and Plaintiff had different chains of command, but were directors of their respective departments and, as Defendants acknowledge, Chapman's department was responsible for entering some of the information used to update the ED Logbook.  Although Chapman's supervisor asserts that she was only subject to the clinical supervisor's directives, O'Neill testified that he could issue a directive to Chapman through her supervisor, which Chapman, like Plaintiff, was obligated to follow.  (O'Neill Dep. 37:4–14.)  In addition, although Chapman's membership in the protected class could undercut an inference of discrimination, at fourteen years younger than Plaintiff, she was still "substantially younger," which supports the inference.  *D'Cunha v. Genovese/Eckerd Corp.*, 479 F.3d 193, 195 (2d Cir. 2007) (eight year age difference "significant enough to support an inference" of discrimination even where younger employee was also within the protected age group); *Sedelnik*

---

logbooks was accurate?  A. It would just be the two of them to my knowledge."); *id* at 97:21–23 ("Q. So it was just Chapman and [Plaintiff] who were responsible for [the Logbook]?  A. Yes.").

*v. City of Bridgeport*, 837 F. Supp. 2d 12, 18 (D. Conn. 2011) (fourteen year difference supported inference of discrimination even where younger employee was also within the protected age group); *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 573 (S.D.N.Y. 2010) (twelve year age difference "sufficiently raised an inference of discrimination"). Based on these disputed issues of fact, a reasonable jury could find disparate treatment supporting an inference of discrimination.

Defendants argue that even if Plaintiff could raise an inference of discrimination, other undisputed facts "so weaken any inference of age discrimination [that they] render it impossible for Plaintiff to establish her *prima facie case*." (Defs. Mem. 14.) As discussed below, even if those facts tend to undermine an inference of discrimination, they do not preclude the inference. Indeed, given Plaintiff's minimal burden at the first step of the *McDonnell Douglas* burden shifting scheme, these arguments are more appropriately raised at the pretext stage. *See Tarshis v. Riese Org.*, 211 F.3d 30, 38–39 (2d Cir. 2000) (finding that the plaintiff had sufficiently established a prima facie case on a motion to dismiss and holding that although the defendant "emphasizes that [the plaintiff] was 47 years old when hired and was already within the class protected by the ADEA. That circumstance may be relevant at the [pretext] stage of the *McDonnell Douglas* inquiry, but it does not compel dismissal of the complaint now"), *abrogated on other grounds by Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002). The Court nevertheless addresses them here.

### 1.   Same actor inference

Defendants argue that Plaintiff cannot establish her prima facie case, in part, because Udisky was the same individual that hired and terminated Plaintiff. (Defs. Mem. 16–17.) Plaintiff does not dispute that Udisky hired her. Plaintiff argues, however, that Udisky was only

the "face" of her firing, and O'Neill, who was seventeen years younger than Plaintiff, was behind her firing.  (Pl. Opp'n 13–14.)

"When the same actor hires a person already within the protected class, and then later fires that same person, 'it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.'"  *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000); *Pronin v. Raffi Custom Photo Lab., Inc.*, 383 F. Supp. 2d 628, 639–40 (S.D.N.Y. 2005) (finding "same actor" inference severely undermined any inference of discrimination and granting summary judgment where the decision-maker was over sixty years old when he hired and terminated employee within two years).  However, "even at the summary judgment stage of litigation, 'the same-actor inference is permissive, not mandatory, and even if the same individuals made both decisions, the Court would not be compelled to give [the defendant] the benefit of the inference.'"  *Benedith v. Malverne Union Free Sch. Dist.*, 38 F. Supp. 3d 286, 319 (E.D.N.Y. 2014) (quoting *Memnon v. Clifford Chance US, LLP*, 667 F. Supp. 2d 334, 351 (S.D.N.Y.2009)).

In applying the same actor inference, "each case must involve an examination of all the circumstances."  *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997).  Although the inference can undermine a prima facie case, "the inference is less compelling when a significant period of time elapses between the [events]."  *Carlton*, 202 F.3d at 138; *Kim v. Dial Serv. Int'l, Inc.*, No. 97-9142, 1998 WL 514297, at *4 (2d Cir. June 11, 1998) (holding refusal to give "same actor" instruction did not prejudice defendants "particularly inasmuch as over six years had passed between the time plaintiff was hired and the time he was fired"); *Benedith*, 38 F. Supp. 3d at 319–20 (finding that the "same-actor" inference did not, preclude Plaintiff's claim where "approximately four years" passed between hiring and firing); *Thomas v. iStar Fin., Inc.*, 438 F.

Supp. 2d 348, 361 (S.D.N.Y. 2006) (rejecting same actor inference given three-year gap and

noting that "[i]n the Second Circuit, the inference no longer applies when more than two years

separate the hiring and firing"), *aff'd*, 629 F.3d 276 (2d Cir. 2010); *cf. Schnabel v. Abramson*,

232 F.3d 83, 91 (2d Cir. 2000) (finding same actor inference "highly relevant" where there was a

three-year gap between hiring and firing).

  Here, the same actor inference does not preclude an inference of discrimination.  There

was a five-year period between Plaintiff's hiring in July of 2007 and her firing in August of

2012, which undermines the strength of the inference.  *See Carlton*, 202 F.3d at 138; *Kim*, 1998

WL 514297, at *4.  Furthermore, there is a factual dispute as to whether O'Neill, Udisky or both

decided to fire Plaintiff.  Although O'Neill testified that Udisky made the decision to fire

Plaintiff, (O'Neill Dep. 18:19–25; 19:7–18), Udisky testified that he and O'Neill jointly decided

to fire Plaintiff, (Udisky Dep. 77:2–5, 78:9–24).  Given the disputed facts as to who made the

decision to fire Plaintiff, the same actor inference is not available, and, even if Defendants had

shown it was, such an inference would not preclude Plaintiff's otherwise established inference of

discrimination.

### 2. Same protected age group inference

  Defendants also argue that because Plaintiff was in the protected age group when hired,

and because Udisky was also within the protected age group, both facts preclude an inference of

discrimination from Udisky's decision to terminate Plaintiff.  (Defs. Mem. 15–16.)  This Court

and others "have recognized that an allegation that a decision is motivated by age animus is

weakened when the decisionmakers are members of the protected class."  *Bruder v. Jewish Bd.*

*of Family & Children's Servs.*, No. 10-CV-5951, 2013 WL 789231, at * 7 (E.D.N.Y. Mar. 4,

2013) (citing cases); *Waters v. Gen. Bd. of Global Ministries*, 769 F. Supp. 2d 545, 554

(S.D.N.Y. 2011) ("[W]here the plaintiff and the individual whose conduct is at issue are members of the same protected class, the inference that the conduct constitutes harassment or discrimination is weakened."). Similarly, "[a]ny inference of age animus is undermined [where] Plaintiff was well within the protected age group when she was hired . . . ." *Bruder*, 2013 WL 789231, at *7 (citing *Baguer v. Spanish Broad. Sys., Inc.*, No. 04-CV-8393, 2010 WL 2813632, at *14 (S.D.N.Y. July 12, 2010) (finding that even assuming there was an inference of discrimination based on the age difference between plaintiff and her replacement, it was undermined by the plaintiff's age at hiring, stating, "[b]eing in the protected class when hired undermines any inference of age discrimination"), *aff'd*, 423 F. App'x 102 (2d Cir. 2011)); *Mathews v. Huntington*, 499 F. Supp. 2d 258, 267 (E.D.N.Y. 2007) ("[T]he inference of discrimination is further weakened by the fact that plaintiff, who was sixty-one years old at the time of his hiring, was well within the protected class when first hired." (citation and internal quotation marks omitted)).

However, neither of these factors is dispositive. *See Tarshis*, 211 F.3d at 38–39 (rejecting defendant's argument that because plaintiff was within the protected age group when hired, she could not establish the prima facie case, noting that such arguments "may be relevant at the [pretext] stage of the *McDonnell Douglas* inquiry . . ."); *Kalra v. HSBC Bank USA, N.A.*, 567 F. Supp. 2d 385, 398 (E.D.N.Y. 2008) (noting that plaintiff's status within the protected class weakened her discrimination claim, but explicitly noting that it was not dispositive) *aff'd*, 360 F. App'x 214 (2d Cir. 2010); *LaGrassa v. Autoone Ins. Co.*, No. 07-CV-1072, 2008 WL 3887606, at *8 (E.D.N.Y. Aug. 20, 2008) ("Although the inference of discrimination is much weaker where plaintiff is well within the protected class when first hired, it is not *a fortiori* foreclosed, and other factors must also be considered." (internal citations and quotation marks

omitted)); *Mathews*, 499 F. Supp. 2d at 267 (noting that the decision-maker's status within the protected class weakened any inference of discrimination, but explicitly noting that fact was not dispositive).  Indeed, as the Second Circuit has recognized, "[t]he proposition that people in a protected category cannot discriminate against their fellow class members is patently untenable." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 55 (2d Cir. 1998).

Here, the only undisputed fact undermining an inference of discrimination is Plaintiff's status as a member in the protected class when she was hired.  Although Defendants highlight Udisky's membership in the protected class, as discussed above, there are disputed factual issues as to whether O'Neill, Udisky or both terminated Plaintiff.  To the extent O'Neill — who is seventeen years younger than Plaintiff — made the decision to fire her, Defendants' argument would be meritless.  Accordingly, although Plaintiff was a member of the protected class when hired, and may have been terminated by Udisky, these non-dispositive facts do not preclude a reasonable jury from finding an inference of discrimination based on Defendants' alleged disparate treatment of Plaintiff.

### 3.    Replacement within the protected class

Defendants also argue that because they replaced Plaintiff with Michael Muratore, who was only two years younger than Plaintiff, there can be no inference of discrimination.  (Defs. Mem. 17–18.)  Plaintiff argues that this fact does not undermine the inference of discrimination for two reasons: (1) Defendants hired Muratore after she filed her complaint with the EEOC and (2) Defendants terminated Muratore after only one year of employment.  (Pl. Opp'n 14.)

Where an employer replaces a member of the protected class with another member of the protected class, that fact may undermine any inference of discrimination.  *See Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 117 (2d Cir. 2010) ("While a plaintiff may usually

[show an inference of discrimination] by showing that she was replaced by someone not in her protected class, Fleming was replaced by another black female, Lisa Derrick." (internal citations omitted)); *Inguanzo v. Hous. & Servs., Inc.*, No. 12-CV-8212, 2014 WL 4678254, at *19 (S.D.N.Y. Sept. 19, 2014) ("Where a member of the plaintiff's protected class is contemporaneously hired as a replacement, the offering of proof of intentional discrimination appears extremely difficult, if not practically impossible." (internal quotation marks omitted) (quoting *Fleming v. MaxMara USA, Inc.*, 644 F. Supp. 2d 247, 266 (E.D.N.Y. 2009) (citing cases), *aff'd*, 371 F. App'x 115 (2d Cir. 2010)); *Johnson v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 314, 323 (E.D.N.Y. 2014) ("Where no other evidence giving rise to an inference of discrimination has been presented, the fact that a plaintiff is replaced with an individual within his protected class undermines his attempt to establish a *prima facie* case of discrimination." (internal quotation marks and alterations omitted); *White v. Pacifica Found.*, 973 F. Supp. 2d 363, 381 (S.D.N.Y. 2013) ("The fact that Plaintiff was replaced by a member of the same protected class further undermines any inference of discriminatory intent."); *Montanile v. Nat'l Broad. Co.*, 211 F. Supp. 2d 481, 487 (S.D.N.Y. 2002) ("That a plaintiff is replaced by another in the same protected class weighs heavily against the inference that she suffered discrimination."), *aff'd*, 57 F. App'x 27 (2d Cir. 2003).

However, this fact is not dispositive, and the focus remains on whether the plaintiff "lost out *because of his age.*" *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (U.S. 1996); *Ferrell v. Leake & Watts Servs., Inc.*, 83 F. App'x 342, 346 & n.2 (2d Cir. 2003) (finding that although the plaintiff "was replaced by two teachers over forty, who were also within the protected class," it did not "on its own, controvert Plaintiff's claim of discrimination," as "the fact '[t]hat one person in the protected class has lost out to another person in the protected class

is . . . irrelevant, so long as he has lost out *because of his age*.'" (quoting *O'Connor*, 517 U.S. at 312)); *see also Miles v. Dell, Inc.*, 429 F.3d 480, 488 (4th Cir. 2005) (noting that "hir[ing] someone from within the plaintiff's protected class in order 'to disguise [an] act of discrimination toward the plaintiff'" is "[o]ne clear example" of when replacement within the protected class does not undermine discrimination). Furthermore, where a replacement within the protected class follows a complaint of discrimination, such timing can support rather than undermine an inference of discrimination. *See Pride v. Summit Apartments*, No. 09-CV-0861, 2012 WL 2912937, at *8 (N.D.N.Y. July 16, 2012) (If the plaintiff's replacement "was hired only *after* [the plaintiff] filed a complaint against [the defendant] . . . it is possible that a rational fact finder could conclude that, rather than rebut the inference of discrimination, the hiring of the African–American employee was merely a cover-up of the prior discrimination."); *cf. Fleming*, 371 F. App'x at 117 ("[W]hile Fleming points to cases concluding that where a plaintiff is replaced with a member of her protected class *after* the filing of a discrimination charge might suggest a cover-up, here Derrick was hired at the same time that Fleming was fired, *before* Fleming took any legal action against defendants." (internal citations omitted)).

Here, although Muratore was within Plaintiff's protected class, his hiring does not preclude an inference of discrimination.[21]  Because it is undisputed that Defendants hired Muratore *after* Plaintiff filed her EEOC complaint, there is at least some limited support for an argument that the hiring was done to mask discrimination. *See Pride*, 2012 WL 2912937, at *8.

---

[21]  Plaintiff's reliance on Muratore's short tenure at the Hospital does not support an inference of discrimination. Without more it is nothing more than speculation that his departure was part of a grand scheme to cover up age discrimination. *See Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 117 (2d Cir. 2010) ("Fleming argues that Derrick was hired to disguise defendants' discriminatory act, but Fleming fails to point to any admissible evidence to support this assertion.").

In addition, although Udisky hired Muratore, it is unclear whether O'Neill, Udisky, or both terminated Plaintiff. *See Miles*, 429 F.3d at 489 (holding that where one person fires an employee and a second person hires the replacement, there is no inference of "non-discrimination," because "the second individual's hiring decision has no probative value whatsoever as to whether the first individual's firing decision was motivated by the plaintiff's protected status."). Thus, because Muratore was hired to replace Plaintiff after Plaintiff filed a complaint with the EEOC, Muratore's hiring does not preclude an inference of discrimination.

Plaintiff has a *de minimis* burden to raise an inference of discrimination, and given the disputed factual issues detailed above, a reasonable jury could find that Plaintiff has satisfied that burden. *Zann Kwan*, 737 F.3d at 844.

### ii.   Legitimate, non-discriminatory reason

Because Plaintiff can establish her prima facie case, the burden shifts to Defendants to proffer non-discriminatory reasons for firing Plaintiff. *Ruiz*, 609 F.3d at 492. This "is not a particularly steep hurdle," *Hyek*, 702 F. Supp. 2d at 93, and [i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff," *Delaney*, 766 F.3d at 168 (citation and internal quotation marks omitted). The burden "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves*, 530 U.S. at 142 (quoting *Hicks*, 509 U.S. at 509).

Here, Defendants proffer numerous non-discriminatory reasons for firing Plaintiff, all relating to Plaintiff's poor job performance. (Defs. Mem. 18.) These include complaints about Plaintiff's failure to address (1) long patient-waiting times, (2) substantial delays in assigning hospital beds and (3) repeated errors in financial and other reports. (*Id.* at 24–25.) In addition, Defendants cite Plaintiff's improper interference with an ongoing investigation and her practice

of leaving her staff without supervision on nights and weekends, as well as her staff's ongoing failures to obtain accurate patient data.  (*Id.* at 25.)  Defendants also rely significantly on Plaintiff's errors and failings in handling the ED Logbook, which Defendants assert warranted termination in and of itself.  (*Id.* at 23–24.)

### iii.   Pretext

Where an employer articulates a non-discriminatory reason for firing the plaintiff, the burden shifts back to the plaintiff to "prove that the employer's proffered reason was a pretext for discrimination."  *Delaney*, 766 F.3d at 168 (quoting *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006)).  Plaintiff argues that she has satisfied this burden, and created a triable issue of fact.  Plaintiff asserts that the "flood of criticism" she experienced when the Hospital changed management, were for the sole purpose of creating a record to justify her termination on the basis of age."  (Pl. Opp'n 17.)  Plaintiff cites her 2011 performance evaluation as evidence of the scheme, given her low ratings in multiple categories for the first time in her career, and asserts that the low ratings were without justification.  (*Id.*)  Plaintiff further asserts that Defendants proffer inconsistent justifications for her termination, demonstrating pretext.  (*Id.* at 19.)

To satisfy the employee's burden, she must present facts, which if "taken in [her] favor, suffice to . . . [show that] a triable issue [exists] as to whether [her] age was a 'but for' cause of [her] termination."  *Delaney*, 766 F.3d at 168 (quoting *Gorzynski*, 596 F.3d at 106).  That age was the "but for" cause of the termination "is not equivalent to a requirement that age was the employers *only* consideration, but rather that the adverse employment action[ ] *would not have occurred without it.*"  *Id.* at 169.  Although "direct evidence of an employer's discriminatory intent will rarely be found," *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997), "[e]ven

in the discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Delaney*, 766 F.3d at 170.  A plaintiff cannot merely rationalize, explain, or disagree with an employer's proffered non-discriminatory reasons to survive summary judgment.  *See Cardo v. Arlington Cent. Sch. Dist.*, 473 F. App'x 21, 23 (2d Cir. 2012) ("While Cardo disputes the specifics of some of the incidents cited by defendants, he does not deny that these incidents occurred, and offers no evidence that the District did not in good faith conclude that he had difficulties getting along with others."); *Woods v. Newburgh Enlarged City Sch. Dist.*, 288 F. App'x 757, 760 (2d Cir. 2008) ("While Woods's claimed misunderstanding of her superior's directive helps explain her exercise of poor judgment, it does not demonstrate the falsity of this non-discriminatory reason for her discharge . . . ." (citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)); *Fleming*, 644 F. Supp. 2d at 266 ("[A] plaintiff's factual disagreement with the validity of an employer's non-discriminatory reason for an adverse employment decision does not, by itself, create a triable issue of fact.").

### 1.    Criticism of Plaintiff's job performance

Plaintiff points to the "flood of criticism" she experienced as evidence of pretext, but does not dispute the incidents, mistakes or misconduct underlying the criticism and Defendants' non-discriminatory reasons for her termination.  (Pl. Opp'n 17–19.)  Plaintiff merely attempts to explain these facts as insignificant or as Defendants' after-the-fact mischaracterizations that were not raised at the time.  (*Id.*)  However based on the record, Plaintiff cannot suggest that she was unaware of the ongoing errors highlighted by Defendants.

In March, May, and June of 2010, the future-Executive Director, Mercieca, wrote directly to Plaintiff about the PAS Department's persistent delays in assigning patients hospital beds via the "bed board," demanding "[n]o more excuses," and expressing concerns that the delays would

prevent the PAS Department from reaching their "metrics."  (Mar. 2, 2010 emails from Mercieca to Plaintiff.)  Plaintiff does not dispute that these problems occurred, or that Mercieca raised them with her.  Instead, Plaintiff asserts that other departments' failures caused the failures in the PAS Department.  (Pl. 56.1 ¶ 8(f); Pl. Decl. ¶ 4.)  In July of 2010, when then-Executive Director Randazzo learned of significant patient registration delays and demanded an investigation, Udisky relayed this information to Plaintiff and directed her to change her process.  (Udisky Decl. ¶¶ 27–28; July 2010 Emails.)  Plaintiff does not dispute the concern expressed by Randazzo, but instead disagrees with the underlying incident that prompted Randazzo's concern.  (Pl. 56.1 ¶ 8(c).)  Similarly, Plaintiff does not dispute that she left her staff unsupervised on nights and weekends, but asserts that she had to do so, because no one approved her request for more staff.  (Pl. 56.1 ¶ 8(d).)

Plaintiff makes similar arguments about the issues raised in 2011.  In August of 2011, Udisky learned that Plaintiff interfered with an investigation of her subordinate, and raised this issue with Plaintiff.  (Udisky Decl. ¶ 56; Pl. Dep. 128:4–130:5.)  Plaintiff does not dispute the accusation or that Udisky spoke with her about it, but asserts that she acted with the Labor Relations and Human Resources departments' "direction and approval."  (Pl. 56.1 ¶ 8(f); Pl. Dep. 128:14–129:4.)  Plaintiff also argues that the well-documented problems with the ED Logbook were caused by Chapman's ED clerks.  (Pl. 56.1 ¶ 10(b); Pl. Decl. ¶ 9.)  Where, as here, the reasons given for Plaintiff's termination are well documented, non-discriminatory, and Plaintiff concedes that these incidents occurred, her rationalizations and explanations are insufficient to show that age was the but-for cause of her termination.  *See Markovich v. City of New York*, 588 F. App'x 76, 77 (2d Cir. 2015) ("While Markovich established a prima facie case of discrimination, he did not dispute the accuracy of the observations reported in his negative

performance reviews."); *Curtis v. Citibank, N.A.*, 70 F. App'x 20, 23 (2d Cir. 2003) ("Although

it is true that a discrimination claim may be supported with only circumstantial evidence,

Citibank presents an abundance of well-documented non-discriminatory explanations for the

adverse actions, and the plaintiffs concede the facts underlying these explanations.").

## 2.   Defendants' "shifting" justifications

Plaintiff also argues that Defendant' justifications for her termination are pretext because

they differ from the justifications given when Defendants terminated her.  (Pl. Opp'n 19.)  An

employer's inconsistent or *post hoc* reasons for firing an employee can be indicia of pretext.  *See*

*Zann Kwan*, 737 F.3d at 847 (finding a jury could infer pretext from the inconsistent

justifications given to the EEOC and in the subsequent Title VII suit, coupled with close

temporal proximity of the discharge and protected activity); *EEOC v. Ethan Allen Inc.*, 44 F.3d

116, 120 (2d Cir. 1994) ("From such discrepancies a reasonable juror could infer that the

explanations given by Ethan Allen at trial were pretextual, developed over time to counter the

evidence suggesting age discrimination uncovered by the state investigation."); *DeMarco v. Holy*

*Cross High Sch.*, 4 F.3d 166, 171 (2d Cir. 1993) (noting that the pretext inquiry considers

"whether the putative non-discriminatory purpose was stated only after the allegation of

discrimination").  Nevertheless, merely having multiple reasons for firing an employee does not

constitute pretext where the differences among them are not materially inconsistent.  *See Roge v.*

*NYP Holdings, Inc.*, 257 F.3d 164, 170 (2d Cir. 2001) (employer's justifications were "variations

. . . on the same theme rather than separate inconsistent justifications"); *Mathews*, 499 F. Supp.

2d at 267 n.6 (The varying "explanations must be *materially* inconsistent with one another."

(citing cases); *accord Zann Kwan*, 737 F.3d at 853 (Parker, J., dissenting) (The record does not

establish that "the allegedly shifting reasons [the defendant] has asserted are in fact

contradictory.  Rather, the shift in business focus and [the plaintiff's] poor performance are complementary — indeed the shift in focus may in fact be a cause of at least some of [the plaintiff's] performance problems.").

Even where an employer's failure to state all its reasons for an adverse action creates some indicia of pretext, Plaintiff must nevertheless show that but for the plaintiff's age, the adverse action would not have occurred.  *See Hu v. UGL Servs. Unicco Operations Co.*, No. 13-CV-4251, 2014 WL 5042150, at *7 (S.D.N.Y. Oct. 9, 2014) ("[E]ven assuming that Plaintiff could establish pretext, he cannot demonstrate that discrimination was the 'but-for' cause of his discharge."); *Hodges v. Rensselaer Hartford Graduate Ctr., Inc.*, No. 06-CV-850, 2008 WL 793594, at *10 (D. Conn. Mar. 20, 2008) ("Even assuming, however, that inconsistencies or other indicia of pretext are present . . . they would not here support, either alone or in conjunction with the other evidence raised by Plaintiff, an inference that discrimination on the basis of age was the real reason for Plaintiff's non-renewal." (citing *Timothy v. Our Lady of Mercy Med. Ctr.*, 233 F. App'x 17, 20 (2d Cir. 2007)).

Plaintiff's argument that Defendants proffer different justifications for her termination fails to show that her age was the "but-for" cause of her termination.  As an initial matter, Plaintiff cannot show that Defendants' reasons for her termination have been inconsistent, unlike the cases relied on by Plaintiff.  *See Ethan Allen*, 44 F.3d at 120 (employer gave varying reasons for employee's discharge, first citing a decrease in work, then performance issues, and finally the employee's alleged lack of qualifications); *Byrnie*, 243 F.3d at 105–06 (citing *Ethan Allen* and finding that a jury could question the real reason for refusing to hire the plaintiff where, among other things, the employer initially cited the plaintiff's unfamiliarity with certain standards, but minimized the importance of the standards in the subsequent civil suit after a search committee

member testified that the hired candidate also lacked familiarity standards).  Defendants have consistently maintained that the ED Logbook was a primary reason for firing Plaintiff. [22]

Plaintiff does not dispute the record of incidents and errors or that her supervisors viewed them as serious errors and frequently discussed them with her.  In fact, though she relies on it now to support allegations of an alleged scheme, Plaintiff admits her acute awareness of the "flood of criticism" leading to her dismissal.  (Pl. Opp'n 17; Pl. Dep. 188:2–15.)  Viewed in the light most favorable to Plaintiff, Defendants' failure to list each undisputed issue at the termination meeting might raise questions as to the totality of events supporting Plaintiff's "unsatisfactory performance," but does not demonstrate that "a reasonable jury could conclude by a preponderance of the evidence that the employer's explanations are pretextual and that, but for . . . [P]laintiff's age, the employer would not have taken the action it did."  *Chapotkat v. Cty. of Rockland*, 605 F. App'x 24, 26 (2d Cir. 2015); *see Delaney*, 766 F.3d at 169 n.2; *Hu*, 2014 WL 5042150, at *7.

### 3.  Plaintiff's remaining pretext arguments

Plaintiff argues that the ED Logbook issues were mere pretext for age discrimination because Defendants decided to fire her before those issues arose.  (Pl. Opp'n 18.)  Plaintiff alleges that during her 2011 evaluation, Udisky stated she should look for a new job.  (Pl. 56.1

---

[22]  While the record does show that Defendants did not specify all the reasons for terminating Plaintiff at the meeting where they terminated her, there is no evidence that Defendants' justifications shifted or were inconsistent.  In his deposition, O'Neill testified that prior to Plaintiff's firing, he, Udisky, and others, discussed Plaintiff's performance issues and investigations by HR into the PAS Department.  (O'Neill Dep. 21:25–22:20.)  In her deposition, Plaintiff testified that at the meeting where Defendants terminated her, the attendees, including Udisky and O'Neill, explained she "was being terminated due to the logbook," without referencing any other reason.  (Pl. Dep. 211:25–212:2.)  Plaintiff's termination letter broadly states that she was terminated "for unsatisfactory performance."  (Termination Letter.)  During this civil action, Defendants have maintained that Plaintiff was terminated for performance issues, and that the ED Logbook issues were critical.  (Udisky Decl. ¶ 72.)

¶ 46.)  However, construed in the light most favorable to Plaintiff, Udisky's statement does not support any discriminatory motive, but rather suggests that he had already determined that Plaintiff's performance was substandard, warranting dismissal.  But Plaintiff was not terminated at that time, and instead, she received additional time to fix errors with the ED Logbook, and failed to do so.  (Defs. 56.1 ¶ 31–42; Pl. 56.1 ¶¶ 31–42 (admitting that "[Plaintiff] had supposedly been working hard to ensure the ED Logbook's accuracy and completeness for almost seven months at that point, and had represented to upper management that she and the managers in her department were auditing the [ED] Logbook daily to ensure it was correct").)  Only after Plaintiff failed to address those errors did Defendants terminate her employment.  Contrary to Plaintiff's assertion, there is no evidence in the record that Defendants delayed her termination to cover any discriminatory action.  The delay between Udisky's comment, and Plaintiff's ultimate firing does not suggest that the delay was in furtherance of some alleged scheme or that age was the but-for cause of Plaintiff's firing.  Rather, as discussed above, Plaintiff was given an opportunity to correct the problems.  Finally, the fact that Muratore replaced Plaintiff only after she filed her EEOC complaint is insufficient to show pretext.  *See Hirschberg v. Bank of Am., N.A.*, 754 F. Supp. 2d 500, 520 (E.D.N.Y. 2010) (defendant terminated plaintiff's substantially younger replacement after plaintiff's EEOC complaint, but the timing of the discharge alone was insufficient to establish pretext).

Given the cumulative weight of the undisputed evidence, a reasonable jury could not find that but for Plaintiff's age, Defendants would not have terminated her.  Accordingly, Defendants' motion for summary judgment as to Plaintiff's discrimination claim under the ADEA and the NYSHRL is granted.

### c.    Retaliation — ADEA and NYSHRL

Like discrimination claims, courts analyze ADEA and NYSHRL retaliation claims under the *McDonnell Douglas* burden-shifting standard.  *See Gorzynski*, 596 F.3d at 110; *Bruder*, 2013 WL 789231, at *7 ("Retaliation claims under the ADEA are also analyzed under the *McDonnell Douglas* burden-shifting test." (citing *Gorzynski*, 596 F.3d at 110)).  First, the plaintiff bears the *de minimis* burden of establishing a prima facie case of retaliation.  *Zann Kwan*, 737 F.3d at 844. If the plaintiff satisfies this burden, "then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory."  *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (citations omitted); *see also Tepperwien v. Entergy Nuclear Operations, Inc*., 663 F.3d 556, 568 n.6 (2d Cir. 2011) (discussing the burden-shifting analysis in retaliation context); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (same).  If the employer succeeds at the second stage, the presumption of retaliation dissipates, and the plaintiff must show that, but for the protected activity, she would not have been terminated.  *See Univ. of Tex. S.W. Med. Ctr. Nassar*, 570 U.S. ---, 133 S. Ct. 2517, 2534 (2013) (holding that a plaintiff asserting a Title VII retaliation claim "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer"); *Wolf v. Time Warner, Inc.*, 548 F. App'x 693, 695 (2d Cir. 2013) ("To prove retaliation, Wolf must show that this [age discrimination] complaint was a 'but for' cause of her termination." (citing *Nassar*, 570 U.S. at ---, 133 S. Ct. at 2528)).[23]

---

[23]   It remains unclear whether "but-for" causation applies to NYSHRL retaliation claims after the Supreme Court's decision in *Nassar*, requiring but-for causation in Title VII retaliation cases.  *See Kleehammer v. Monroe Cty.*, 583 F. App'x 18, 21 (2d Cir. 2014) ("We have not decided whether the but-for-causation standard also now applies to retaliation claims under NYSHRL."); *Giudice v. Red Robin Int'l, Inc.*, 555 F. App'x 67, 70 n.1 (2d Cir. 2014) (refusing to address the question as non-dispositive); *Zann Kwan*, 737 F.3d at 847 n.7 ("Because the

### i.    Prima facie case

In order to establish a prima facie case of retaliation, a plaintiff must establish that "(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action."  *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)); *see Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013). Plaintiff's burden "is minimal and *de minimis*," and the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.  *See Zann Kwan*, 737 F.3d at 844; *Campbell v. New York City Transit Auth.*, --- F. Supp. 3d ---, 2015 WL 1349820, at *16 (E.D.N.Y. Mar. 26, 2015) (citing *Zann Kwan*, 737 F.3d at 844).

Defendants do not dispute that Plaintiff has satisfied the first three elements.  Plaintiff's

---

plaintiff's claims survive under the *Nassar* 'but-for' standard, we do not decide whether the NYSHRL claim is affected by *Nassar,* which by its terms dealt only with retaliation in violation of Title VII."); *see also St. Juste v. Metro Plus Health Plan*, 8 F. Supp. 3d 287, 321 n.14 (E.D.N.Y. 2014) (detailing the similarities between the statutory texts of Title VII and NYSHRL and noting the ambiguity as to whether "but for" causation applies to NYSHRL retaliation claims).  Because the NYSHRL has traditionally followed the federal discrimination laws' analytical framework, this Court will continue applying "but for" causation to NYSHRL retaliation claims.  *See Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 218–22 (E.D.N.Y. 2014) (applying but-for standard to retaliation claims under Title VII and NYSHRL); *Sass v. MTA Bus Co.*, 6 F. Supp. 3d 238, 247 (E.D.N.Y. 2014) (applying "but-for" standard to vacate NYSHRL verdict on retaliation claim); *St. Juste*, 8 F. Supp. 3d at 321 n.14 (same); *Weber v. City of New York*, 973 F. Supp. 2d 227, 266 (E.D.N.Y. 2013) ("[B]ased on the Supreme Court's statutory analysis in *Nassar* and *Gross* . . . and the similarity of the language in the ADEA retaliation statute, the Court finds that Plaintiff must prove but-for causation in order to establish an ADEA retaliation claim." (internal citations omitted)); *see also Richardson v. Bronx Lebanon Hosp.*, No. 11-CV-9095, 2014 WL 4386731, at *16 n.16 (S.D.N.Y. Sept. 5, 2014) (citing cases in this Circuit and applying the but-for causation standard); *Taylor v. Seamen's Soc. For Children*, No. 12-CV-3713, 2013 WL 6633166, at *23 (S.D.N.Y. Dec. 17, 2013) (same).

letter to NSLIJ Health System CEO Michael Dowling complaining of discrimination was a protected activity, her firing was an adverse employment action, and Defendants' "general corporate knowledge" was sufficient to establish Defendants' knowledge. (Defs. Mem. 30.) The only element Defendants contest is the "causal connection" between the protected activity and Plaintiff's termination. (*Id.*)

Defendants argue that although their general corporate knowledge satisfies the knowledge element of Plaintiff's prima facie case, because Udisky and O'Neill lacked knowledge of Plaintiff's complaint when they terminated her, Plaintiff cannot establish a causal connection between her protected activity and her termination. (*Id.*; Defs. Reply 8–9.) Plaintiff argues that temporal proximity between the protected activity and her firing is sufficient to show a causal connection for her prima facie case. (Pl. Opp'n 20–21.)

Plaintiff cannot rely on general corporate knowledge alone to satisfy the third "causal connection" prong. *See Zann Kwan*, 737 F.3d at 844 n.4 ("[The plaintiff] cannot satisfy the causation prong through mere corporate knowledge . . . ."); *Weber v. City of New York*, 973 F. Supp. 2d 227, 268 n.25 (E.D.N.Y. 2013) (holding that the defendant's corporate knowledge satisfied the "knowledge" prong but was insufficient, without more, to satisfy the "causal connection" prong (citing *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). However, one way to present evidence of a causal connection is through the temporal proximity between the protected activity and the adverse employment action. *See Zann Kwan*, 737 F.3d at 844 n.4 ("[The plaintiff] demonstrates causation indirectly by the temporal proximity between her complaint and her termination . . . ."). There is no bright line for when two events are sufficiently close in time to support a causal connection, but "the Second Circuit has held that periods as long as five months are not too long." *Weber*, 973 F. Supp. 2d at 270–71 (citing

*Gorzynski*, 596 F.3d at 110–11); *see Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014) (noting that "five months might be enough to establish a prima facie case").

Although there may be no bright line, "[w]here, as here, a plaintiff relies exclusively on timing to [establish] causation, the temporal proximity between the protective activity and adverse employment action must be 'very close.'" *Vale v. Great Neck Water Pollution Control Dist.*, 80 F. Supp. 3d 426, 441 (E.D.N.Y. 2015) (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *Henry v. N.Y.C. Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 412 (S.D.N.Y. 2014) ("While the Second Circuit has articulated no 'bright line' rule for when an alleged retaliatory action occurs too far in time from the exercise of a federal right to be considered causally connected, it is well settled that when 'mere temporal proximity' is offered to demonstrate causation, the protected activity and the adverse action must occur 'very close' together." (citation and internal quotation marks omitted) (citing cases)); *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) ("[D]istrict courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation.") (collecting cases). Indeed, where timing is the only evidence of causal connection, the facts and circumstance of a given case become more relevant. *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").

Further, where it is undisputed that the decision maker was unaware of the employee's protected activity, that fact may be evidence that there is no causal connection. *Papelino v. Albany Coll. of Pharm. of Union Univ.*, 633 F.3d 81, 92 (2d Cir. 2011) ("[L]ack of knowledge on

42

the part of particular agents who carried out the adverse action is evidence of lack of causal connection . . . ." (citing *Gordon*, 232 F.3d at 117); *Gordon*, 232 F.3d at 117 ("The lack of knowledge on the part of particular *individual agents* is admissible as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity . . . ."); *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 859 (S.D.N.Y. 2013) ("[T]he lack of evidence indicating knowledge of particular individual agents can doom a plaintiff's ability to show the fourth element (causation)." (citing *Gordon*, 232 F.3d at 117)).  A plaintiff may still establish a causal connection by "counter[ing] with evidence that the decision-maker [who lacked knowledge] was acting on orders or encouragement of a superior who did have the requisite knowledge."  *Papelino*, 633 F.3d at 92 (citing *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 148 (2d Cir. 2010) and *Gordon*, 232 F.3d at 117); *see Summa*, 708 F.3d at 127 ("To the extent that decisionmaker knowledge is relevant in establishing causation, that knowledge may be satisfied by demonstrating that 'the agent who decides to impose the adverse action but is ignorant of the plaintiff's protected activity *acts pursuant to encouragement by a superior* (who has knowledge) to disfavor the plaintiff.'" (quoting *Henry*, 616 F.3d at 148)).

Here, Plaintiff wrote to CEO Dowling on or about March 25, 2012, and Defendants terminated her four and a half months later, on August 18, 2012.  (Defs. 56.1 ¶¶ 47, 49; Pl. 56.1 ¶¶ 47, 49.)  This close temporal proximity may raise some inference of a causation connection between Plaintiff's protected activity and her firing. *See Summa*, 708 F.3d at 127; *Gorzynski*, 596 F.3d at 110–11.  However, it is the only evidence Plaintiff presents to show a causal connection, and Plaintiff does not dispute that the relevant decision-makers — Udisky and O'Neill — had no knowledge of her protected activity until after she was terminated.  (Defs. 56.1 ¶ 54; Pl. 56.1 ¶ 54; Pl. Mem. 20–21.)  In the ordinary case where a decision-maker denies direct knowledge, the

plaintiff's claim may survive if there is "evidence that the decision-maker was acting on orders or encouragement of a superior who did have the requisite knowledge." *Papelino*, 633 F.3d at 92. However, Plaintiff has failed to present any evidence permitting such an inference here.

First, although it is undisputed that Dowling and O'Neill communicated regularly, there is no evidence that they communicated about Plaintiff or issues that concerned Plaintiff. (*See* O'Neill Dep. 15:17–17:16.) Second, and most importantly, although it is undisputed that Dowling's office received Plaintiff's letter, there is no suggestion by Plaintiff or in the record that Dowling — or anyone else at NSLIJ — was aware of Plaintiff's complaints before her termination.[24] This is critical, because without such knowledge, there is no basis to conclude that a superior directed or encouraged her termination on basis of the letter. Although Plaintiff has only a *de minimis* burden at the prima facie stage, because Plaintiff does not dispute that the decision-makers were wholly unaware of her protected activity and presents no facts permitting a reasonable jury to conclude that someone with knowledge of her protected activity directed or encouraged these unknowing decision-makers to terminate her, she has failed to satisfy even that minimal burden. *See Papelino*, 633 F.3d at 92; *Summa*, 708 F.3d at 127; *Bloomberg L.P.*, 967 F. Supp. 2d at 859. However, as discussed below, even if Plaintiff had established a prima facie case, Plaintiff cannot show that "but for" her protected activity, she would not have been terminated.

---

[24] Even when viewing the record in the light most favorable to Plaintiff, there is no evidence suggesting that Dowling knew what was in the letter. Someone among Dowling's staff read Plaintiff's letter and knew it presented a legal issue, because they forwarded it to the NSLIJ's Office of Legal Affairs. (Defs. 56.1 ¶ 52; Pl. 56.1 ¶ 52.) There is no evidence illuminating when or how Dowling's staff made the decision; only that someone forwarded it "in the ordinary course." (Defs. 56.1 ¶ 53; Dore Decl. ¶ 9.) At some point, someone forwarded the letter again, this time to a paralegal, on whose desk it remained until Plaintiff was terminated. (Defs. 56.1 ¶¶ 52–53; Pl. 56.1 ¶¶ 52–53.)

### ii.   Non-retaliatory reasons

Defendants' proffered nondiscriminatory reasons for firing Plaintiff apply equally to her retaliation claim.  As discussed in detail above, Plaintiff's supervisors repeatedly noted Plaintiff's poor performance through the years, particularly in 2011.  As Plaintiff failed to correct these errors, and made serious new errors in handling the ED Logbook, Defendants decided to terminate her employment.  In light of these non-retaliatory reasons, the burden shifts back to Plaintiff to show that these reasons are mere pretext.

### iii.   Pretext

To survive summary judgment on a claim of retaliation, a plaintiff must show that retaliatory intent was the "but-for" cause of any wrongful actions — that is, "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Nassar*, 570 U.S. at ---, 133 S. Ct. at 2533; *Zann Kwan*, 737 F.3d at 850 (noting that Title VII retaliation claims must show "but-for" causation) (citing *Nassar*, 570 U.S. at ---, 133 S. Ct. at 2533).  "Temporal proximity alone is insufficient to defeat summary judgment at [this] stage."  *Zann Kwan*, 737 F.3d at 847; *see Abrams*, 764 F.3d at 254 ("[T]emporal proximity alone is not enough to establish pretext in this Circuit." (citing *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010)); *Rumsey v. Northeast Health, Inc.*, --- F. Supp. 3d ---, 2015 WL 791794, at *18 (N.D.N.Y. Feb. 25, 2015) (finding temporal proximity "particularly insufficient" to show pretext where although there was a short time period between the employee's activity and termination, the employee had a history of problems pre-dating the protected activity and had committed serious misconduct post-dating the protected activity). "However, a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat

summary judgment at [the pretext] stage." *Zann Kwan*, 737 F.3d at 847 (finding close temporal proximity and inconsistent explanation for termination sufficient to raise a triable issue of fact as to pretext); *see Cowan v. City of Mount Vernon*, --- F. Supp. 3d ---, 2015 WL 1400088, at *23 (S.D.N.Y. 2015) (finding temporal proximity of mere days along with the lack of evidence or indication that the employee was a poor performer sufficient to raise a triable issue of fact as to pretext).

Here, temporal proximity alone is insufficient to show Defendants' reasons are pretext, and Plaintiff presents no other evidence from which a reasonable jury could find that retaliation was the but-for cause of Plaintiff's termination. This is not a case where the Hospital viewed Plaintiff's performance negatively only after she sent a letter to Dowling complaining of discrimination. Nor is it a case where the Hospital has provided inconsistent justifications for her termination. Plaintiff's sharply negative 2011 evaluation preceded Plaintiff's letter to Dowling, and addressed her poor performance, in particular with the ED Logbook. Indeed, Plaintiff herself asserts that Defendants were determined to fire her at the time of the 2011 evaluation. (Pl. Dep. 56:6–10; *see also* Pl. Opp'n 18.)

Moreover, beginning in 2009, Plaintiff's supervisors routinely raised similar issues with her performance and demanded that she make corrections. In addition, as discussed above in connection with Plaintiff's discrimination claims, Defendants' reasons for Plaintiff's termination have remained consistent — they terminated her for her documented poor performance in multiple areas, and in particular, for the problems with the ED Logbook. Because Plaintiff fails to raise additional evidence that these reasons are pretext, no reasonable jury could find that but-for Plaintiff's letter to Dowling, her employment would not have been terminated. *See Abrams*, 764 F.3d at 255. Accordingly, the Court grants Defendants' motion for summary judgment as to

Plaintiff's ADEA and NYSHRL retaliation claims.

### iv.  NYCHRL claims and attorneys' fees

Plaintiff also brings claims of age discrimination and retaliation in violation of the NYCHRL.  (Compl. ¶ 43.)  "District courts may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (citations and internal quotation marks omitted); *Spiegel*, 604 F.3d at 83 ("[T]he district court may also decide whether to exercise supplemental jurisdiction over this claim; it may determine that this area of law would benefit from further development in the state courts and therefore dismiss the claim without prejudice to refiling in state court."); *see also One Commc'ns Corp. v. J.P. Morgan SBIC LLC*, 381 F. App'x 75, 82 (2d Cir. 2010) ("If all of a plaintiff's federal claims are dismissed, a district court is well within its discretion to decline to assert supplemental jurisdiction over any state law claims"); *Sullivan v. City of New York*, No. 10-CV-0038, 2011 WL 3806006, at *6 (S.D.N.Y. Aug. 29, 2011) ("[W]here federal claims are dismissed before trial, the state [claims] should be dismissed as well." (quoting *Marcus v. AT & T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998))).  The Court declines to exercise supplemental jurisdiction over the remaining state law claims.  Plaintiff's age discrimination and retaliation claims pursuant to the NYCHRL are therefore dismissed without

prejudice to re-file in state court.[25]

### III.   Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment as to Plaintiff's ADEA and NYSHRL discrimination and retaliation claims, and dismisses Plaintiff's NYCHRL claims without prejudice.  The Court denies Defendants' motion for attorneys' fees without prejudice.

SO ORDERED:


_____s/MKB_____
MARGO K. BRODIE
United States District Judge


Dated: September 22, 2015
       Brooklyn, New York

---

[25]   Defendants also moved for attorneys' fees under a provision of the New York City Administrative code permitting a court to award attorneys' fees to a prevailing party in a NYCHRL discrimination suit.  *See* N.Y.C. Admin. Code § 8-502(f).  Because the Court declines to exercise supplemental jurisdiction over Plaintiff's NYCHRL claims, Defendants' motion for attorneys' fees is moot, and the Court expresses no view as to the merits of Defendants' request.